# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

\* \* \*

R&R WHEELER TILE COMPANY, et al.,

    Plaintiffs,

v.

RED I CHALLENGE CORP. USA, et al.,

    Defendants.

2:99-cv-01387-LRL

**FINDINGS OF FACT & CONCLUSIONS OF LAW**

This matter came on for trial without a jury on February 9, 2004. Steven J. Parsons and Stephanie Karp appeared on behalf of plaintiffs; Michael F. Bohn appeared on behalf of defendants. The court having reviewed the pleadings, heard and considered the testimony of the witnesses, and reviewed the exhibits, makes the following findings of fact and conclusions of law.

**FINDINGS OF FACT**

1. At all material times, plaintiff, R&R Wheeler Tile Co., was a California corporation with its principal place of business in the County of San Diego, California. Plaintiff, Arthur L. Wheeler Jr., also known as Roy Wheeler, was an individual residing and doing business in the State of California.

2. At all material times defendant, Red I Challenge Corporation (hereafter Red I), was a Nevada corporation with its principal place of business in the State of Nevada. Defendants Robin E. Doidge and Arlene R. Doidge were individuals who, at the time the present action was brought, resided in the State of Nevada. At all times relevant to this action, Robin E. Doidge was the president of Red I, and Arlene R. Doidge was an officer and director of Red I.

3. At all material times, Red I manufactured and marketed "Sure Seal" masonry sealant and other related protective coating products.

4. In early to mid-1997 Roy Wheeler saw Red I's products displayed at a trade show in Las Vegas, and expressed interest in becoming a distributor of Red I's products in Southern California.

5. Roy Wheeler met with Robin and Arlene Doidge in Las Vegas on September 10, 1997, to discuss the specific terms and conditions under which Roy Wheeler could open a Red I distributorship in Southern California. It was agreed that, among other things, it would be Roy Wheeler's responsibility to obtain from the environmental protection authorities in Southern California the regulations and labeling requirements regarding volatile organic compounds ("VOCs") typically contained in sealant products. Such products containing toxic compounds at unsafe levels can pose a hazard to the environment. That it was Roy Wheeler's responsibility to obtain such information was memorialized in a Summary of Meeting Notes dated September 10, 1997, and faxed by Red I to Roy Wheeler on September 11, 1997. *See* Defendants' Exhibit A in evidence.

6. Some time after the September 10, 1997 meeting, but prior to the execution of a written contract, Robin Doidge provided Roy Wheeler with Material Safety Data Sheets ("MSDS") describing the chemical composition of the products in question, including the VOC content, so that Roy Wheeler could inquire of the concerned environmental protection authorities whether the products complied with the law.

7. On October 21, 1997, Roy Wheeler and Red I entered into a written contract wherein Wheeler agreed to purchase and become a distributor of Red I's Sure Seal protective coating products, including Sure Seal Quick Dry, Sure Seal Slow Dry, and Sure Seal 2000. The contract provided, in pertinent part, that Wheeler would make an initial purchase of 55 gallons of Sure Seal for $9,000.00, and thereafter five (5) gallon quantities of Sure Seal and other Red I products at a reduced price of $35.00 per gallon. As a distributor of Red I products, Wheeler's territory was to extend from the "Mexican border to Orange County border, Riverside County, San Bernardino, Palm Springs, El Centro to the border, San Diego (including north and east counties)." The contract required Wheeler to perform applicator work in his territory, to work closely with Robin Doidge in order to "maintain the high

quality of said product and marketing of that product throughout [Wheeler's] territory," and to fax weekly reports to Red I on sales and applications for that week. The contract provided for a 50-50 split of profits of all applications and sales less applicable commissions, and reflected Red I's expectation that after ninety days "sales or use of chemicals would be a minimum of 55 gallons per week for the territory." *See* Plaintiffs' Exhibit 1 in evidence. The contract contained no warranties or other representations regarding the products' compliance with environmental regulations in Southern California, including San Diego County.

8. At the time the original contract was signed, Roy Wheeler delivered a check in the amount of $9,000.00 for his initial purchase of the Sure Seal product.

9. By February, 1998, Roy Wheeler had not made any additional orders for any Red I product. Nor had he scheduled the required training to sell the Sure Seal product, or faxed weekly reports to Red I regarding sales and/or applications performed during the week.

10. In late April, 1998, Robin Doidge traveled from Las Vegas to the Hyatt Hotel in La Jolla, California to give a demonstration to Roy Wheeler of another Red I product called Safe Step. Instead of attending the demonstration himself, Roy Wheeler sent his son Ryan Wheeler.

11. In May, 1998, as an incentive to Roy Wheeler to sell Red I products, Red I and Roy Wheeler agreed to modify the original contract from a 50/50 profit share to an 80/20 profit split in favor of Roy Wheeler. The modified agreement also permitted Roy Wheeler to transfer his interest in the original contract to R&R Wheeler Tile Company (hereafter "R&R Wheeler"). The modified agreement also required, among other things, that R&R Wheeler provide Red I on a monthly basis a current list of all clients and work performed or to be performed. The modified agreement also required R&R Wheeler to provide to its buyers the appropriate Material Safety Data Sheet and instructions in the safe handling and application of the product.

12. On May 11, 1998, R&R Wheeler placed an order for a 55 gallon drum of Safe Step, which was shipped on June 1, 1998. The cost of the order was $2,475.00.

1  13. At no time prior to August, 1998 did plaintiffs or anyone acting on their behalf attempt to
2  determine what regulations and labeling requirements existed in any county within plaintiffs' territory,
3  including San Diego County, regarding the application or sales of products containing VOCs.

4  14. During the first week of August, 1998, Ryan Wheeler learned that a sample of the Sure Seal
5  product that R&R Wheeler had put down at Sea World several weeks earlier (in the hope that it would
6  be awarded a contract at Sea World) had VOC emission levels that were twice the legal limit in San
7  Diego County. On September 1, 1998, the County Air Pollution Control District formally notified R&R
8  Wheeler that the Sure Seal products at issue did not meet Control District standards, and that any
9  application of the coatings would violate District rules.

10  15. Three weeks later, on September 22, 1998, Ryan Wheeler wrote a letter to Robin Doidge,
11  informing him that the San Diego County Air Pollution Control District had ordered R&R Wheeler not
12  to distribute or install Sure Seal due to its excessive VOC level. Noting that this was a "huge
13  embarrassment" to the business, Ryan Wheeler complained that "[t]his is something that Red I
14  Challenge Corp. should have taken care of as a manufacturer." Exhibit 42. On the advice of an attorney
15  the letter closed with "a demand that we be compensated for our losses, since we can no longer use Sure
16  Seal Products. If there is a reasonable explanation please respond!" *Id.*

17  16. On September 25, 1998, Robin Doidge called Ryan Wheeler and told him that Red I could
18  provide a reformulated product that would meet San Diego County emission standards. Doidge invited
19  Ryan Wheeler to come to Las Vegas to discuss the matter, and offered to set aside two gallons of the
20  reformulated product for him for testing purposes at Sea World. Doidge also faxed a new MSDS sheet
21  to Ryan Wheeler for the reformulated product. The sheet reflected VOC levels that met San Diego
22  County standards.

23  17. Ryan Wheeler did not meet with Robin Doidge in Las Vegas. He did not discuss the new
24  MSDS sheet with Sea World or the Air Pollution Control District. He did not respond to Robin
25  Doidge's offer to provide a product that complied with San Diego County Air Pollution Control District

4

standards. Instead, R&R Wheeler filed this lawsuit.

## CONCLUSIONS OF LAW

18. The court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.

19. A valid breach of contract claim has four elements. A plaintiff must establish that (1) a valid contract existed, (2) the plaintiff performed as specified by the contract, (3) the defendant failed to perform as specified by the contract, and (4) the plaintiff suffered an economic loss as a result of the defendant's breach. *Kreiss v. McCown DeLeeuw & Co.*, 37 F.Supp.2d 294, 298 (S.D.N.Y. 1999). In Nevada, "an implied covenant of good faith and fair dealing exists in *all* contracts." *A.C. Shaw Construction, Inc. v. Washoe County*, 784 P.2d 9, 10 (Nev. 1989)(emphasis in original). "Under the implied covenant, each party must act in a manner that is faithful 'to the purpose of the contract and the justified expectations of the other party.'" *Morris v. Bank of America Nevada*, 110 Nev. 1274, 1278 (1994)(quoting *Hilton Hotels Corporation v. Butch Lewis Productions, Inc.*, 107 Nev. 226, 234 (1991)). A party to a contract breaches the implied covenant of good faith and fair dealing by interfering with or failing to cooperate with the plaintiff in the performance of the contract. Witkin, Summary of California Law, Contracts, § 744 (8th ed.).

20. The distributorship contract between plaintiffs and Red I Challenge Corporation, dated October 21, 1997, is valid and enforceable.

21. The May, 1998 modified distributorship contract between plaintiffs and Red I Challenge Corporation is valid and enforceable.

22. Plaintiffs breached the modified contract by failing to provide monthly accounting, sales reports and client lists to defendants.

23. It was the understanding of the parties that plaintiffs would be responsible for obtaining the environmental regulations and labeling requirements in Southern California for the VOCs contained in the Red I sealant products. Plaintiffs made no effort to do so before they attempted to land a contract with Sea World in the summer of 1998. Accordingly, plaintiffs are responsible for Sea World's

rejection of the product, and San Diego County's prohibition against the use of the product, because its VOC content exceeded San Diego County's standards.

24. When plaintiffs notified defendants that the product that was tested at Sea World did not comply with San Diego County air pollution standards, defendants offered in good faith to substitute a reformulated product that met the County's standards. The implied covenant of good faith and fair dealing required plaintiffs to cooperate with defendants in an effort to accomplish the purpose of the contract, *viz*., to successfully market, apply and sell defendants' products in the Southern California area. Plaintiffs breached that duty when they deliberately ignored defendants' offer and failed to cooperate with defendants. Instead, plaintiffs filed this lawsuit.

25. The court concludes that plaintiffs have failed to prove by a preponderance of the evidence any of plaintiffs eight (8) causes of action. Accordingly, as to plaintiffs' eight (8) causes of action, judgment will be entered for defendants.

26. The court concludes that defendants have proven by a preponderance of the evidence its counter-claims that (1) plaintiffs breached the distributorship contract by not putting forth their best efforts to market, sell and distribute defendants' sealant products, and (2) breached the implied covenant of good faith and fair dealing by not responding to defendants' offer to substitute a reformulated product that complied with San Diego County air pollution standards. The court has found, however, and finds that defendants have failed to prove the extent, if any, to which they were damaged by plaintiffs' breach of the contract or its implied covenant of good faith and fair dealing. Accordingly, as to defendants' two (2) counter-claims, judgment will be entered for defendants in the amount of $1.00.

The Clerk of Court is directed to enter judgment accordingly.

DATED this 9th day of September, 2010.

*[signature: Leavitt]*

**LAWRENCE R. LEAVITT**
**UNITED STATES MAGISTRATE JUDGE**